**In re Grand Jury Investigation of the AVIATION INSURANCE INDUSTRY.**

United States District Court
S. D. New York.
April 13, 1960.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Associated Aviation Underwriters, Frederick A. O. Schwarz, Porter R. Chandler, James A. Thomas, Jr., New York City, of counsel.

Kelley, Drye, Newhall & Maginnes, New York City, for Aviation Ins. Rating Bureau, John W. Drye, Hancock Griffin, Jr., New York City, of counsel.

S. Hazard Gillespie, Jr., U. S. Atty., New York, Robert A. Bicks, Acting Asst. Atty. Gen., Edward B. Kenney, Herbert F. Peters, Attys., Dept. of Justice, Antitrust Division, Washington, D. C., for Antitrust Division, Dept. of Justice.

CASHIN, District Judge.

Nominally, these are motions made by two entities, Associated Aviation Underwriters (AAU) and Aviation Insurance Rating Bureau (AIRB), which have been served with grand jury subpoenas duces tecum, for orders quashing those subpoenas. However, the orders, if granted on the basic ground urged by the movants, would result in a judicial determination not only that the subpoenas presently under attack should be quashed but also that absolutely no authority exists for the Antitrust Division of the Justice Department to conduct any investigation of the aviation insurance industry. Accordingly, I will treat these motions, as I must, as seeking an order quashing not only the particular subpoenas nominally under attack but the entire investigation.

Movant AAU is an association of insurance companies which, in effect, conducts the business of the member insurers insofar as aviation risks are concerned. The types of coverage handled by AAU are—

(1) aircraft hull insurance;

(2) aircraft personal injury and death and property liability insurance;

(3) general liability insurance divided into airport liability, airline ground liability and products liability;

(4) workmen's compensation and employers' liability insurance; and

(5) personal accident insurance.

The vast majority of the contracts of insurance entered into by AAU arise in New York.[1]

AIRB is a rating organization formed under the laws of the State of New York. Membership therein is open to any capital stock insurer authorized to write insurance for which AIRB prescribes rates. Any insurer may become a subscriber to AIRB under conditions set out in its constitution. AIRB prescribes rates for aircraft hull, aircraft passenger liability, aircraft property damage liability and employers' aviation indemnity insurance. It does not prescribe rates for personal accident insurance, workmen's compensation insurance, airport and hangar keepers' liability insurance and aircraft manufacturers' products liability insurance. The precise method of the setting of rates and the extent of their binding force on members of AIRB will not be reviewed, as unnecessary to this decision.

At the present time, it would appear that the constituency of both of the moving parties is exactly the same.

The subpoenas currently attacked are grand jury subpoenas. It is clear, however, that even though the subpoena powers of a grand jury impanelled by the District Court for the Southern District of New York are being utilized, no grand jury proceedings, in the sense of actual presentation to the body of evidence with a view toward the obtaining of an indictment or indictments, are presently being conducted. Rather, the investigation is in its preliminary stage and the documents subpoenaed are actually being sought for examination by attorneys of the Antitrust Division of the Department of Justice. This conclusion is impelled by the fact that "In December 1959, the Attorney General of the United States author-

---

1. The exceptions are workmen's compensation policies, personal accident policies and "risks located in California". The last category of risks, while probably understandable to the trade, is not at all clear to me.

ized a grand jury investigation of possible violations of the federal antitrust laws by persons, firms, associations and corporations engaged in the business of insurance". (Memorandum of the United States in Opposition to Motion to Quash Subpoenas Duces Tecum submitted on the instant motions).[2] Because of the time necessary in conducting a widespread antitrust investigation, it is highly unlikely that the case could possibly be in such a posture as to be ready for presentation. This conclusion is buttressed by consideration of the fact that, in connection with this same investigation, the Attorney General's staff, about March 7, 1960, submitted, *ex parte*, an order which would have provided for the "impounding" of documents delivered pursuant to a grand jury subpoena duces tecum so that "attorneys for the United States [could] study, analyze and examine same" at Washington, D. C.[3]

This utilization of grand jury subpoenas for administrative investigations is not new. The Report of the Attorney General's National Committee to Study the Antitrust Laws, submitted on March 31, 1955, stated: (at pg. 344)

"Present procedures enable the Department of Justice to employ compulsory process to obtain both documentary and testimonial evidence at every stage of criminal and civil antitrust proceedings—except during the investigative stage of a matter in which civil proceedings are, from the outset, contemplated.

"Where indictment is contemplated, the federal grand jury is equipped with ample powers to permit the fullest investigation. The grand jury subpoena may be used to compel the discovery of all documentary material reasonably required as well as the testimony of witnesses under oath."

Thus, it is clear that the United States considers the grand jury and the District Court as its adjuncts, at least in the investigative stage of criminal antitrust proceedings. It is equally clear that the instant proceedings are in that stage.

■ I point out these facts not for the purpose of expressing carping criticism.[4] Perhaps, utilization of the grand jury and the Court is necessary for the Department of Justice to perform the function assigned to it by Congress of enforcing the antitrust laws, when Congress has not given that Department its own subpoena powers.[5] Rather, I think these facts relevant to the present decision because of the Government's reliance upon Blair v. United States, 1919, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 679 for the proposition that movants have absolutely no standing to question the jurisdiction of the grand jury to subpoena them. In the Blair case, the witnesses, who were denied standing to test a grand jury's jurisdiction, actually appeared before the jury and then and there refused to testify. Therefore, the grand jury was performing its traditional function. Here, as shown above, it is not. Without at all presuming to question the current vitality of the Blair case, I feel safe in holding that the courts, since they are being utilized as a tool of the Department of Justice for criminal antitrust investigative proceedings, have the right to determine that they are not being so used in an investigation which can never reach fruition.[6]

---

2. It is, of course, unnecessary for the Attorney General to "authorize" any true Grand Jury investigation.

3. Incidentally, I declined to sign the order for reasons stated in a memorandum endorsed on the order. (See In re Grand Jury Subpoena Duces Tecum to Stewart, Smith & Company, M–11–188).

4. The movants have not attacked the subpoenas on the ground that they are being used for investigative rather than presentation purposes.

5. However, the Department of Justice has been subject to criticism by the courts for such utilization. Durbin v. United States, 1954, 94 U.S.App.D.C. 415, 221 F.2d 520.

6. The Supreme Court has recognized that grand jury proceedings can be "subverted" by the Department of Justice in

As I have implied previously, the gravamen of the moving papers is that the subpoenas under attack have absolutely no validity. This, movants argue, follows since the investigation being conducted looks toward criminal indictments for violations of the federal antitrust laws by persons in the insurance business and the insurance business is exempt from the operation of those laws, at least insofar as the activities of the movants are concerned. This exemption is contended for under the provisions of the McCarran-Ferguson Insurance Act of 1945, the relevant portions of which are set out below.

Title 15 U.S.C. "§ 1011. Declaration of policy.

"Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"§ 1012. Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948.

"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended,

known as the Sherman Act, and the Act of Ocober 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

"§ 1013. Suspension until June 30, 1948, of application of certain Federal laws; Sherman Anti-Trust Act applicable to agreements to, or acts of, boycott, coercion, or intimidation.

"(a) Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, and the Act of June 19, 1936, known as the Robinson-Patman Anti-Discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.

"(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

\* \* \* \* \* \*

"§ 1015. Definition of 'State'

"As used in this chapter, the term 'State' includes the several States, Alaska, Hawaii, Puerto Rico, Guam, and the District of Columbia."

A short review of the history of this legislation is necessary to an understanding of its application to the case at bar. The Supreme Court had upheld rather stringent state regulations of the insurance business and state taxes thereon against attacks that such state control was violative of the commerce clause.

---

an antitrust case if civil rather than criminal prosecution is contemplated. United States v. Procter & Gamble, 1958, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077.

Certainly, such "subversion" can be equally present if, as argued by movants, no proceedings, either civil or criminal, are possible.

Paul v. State of Virginia, 1868, 8 Wall. 168, 75 U.S. 168, 19 L.Ed. 357 was the leading case cited in support of this proposition. Despite the fact that the line of cases upheld state regulations rather than inhibited federal control, the popular conception apparently arose that the insurance business was not interstate commerce so as to be within the reach of federal regulatory acts such as the Sherman and Clayton antitrust laws. This conception impelled the District Court for the Northern District of Georgia to dismiss an indictment charging numerous corporations and individuals with a conspiracy in violation of Section 1 of the Sherman Act.[7] On direct appeal to the Supreme Court, the dismissal of the indictment was reversed.[8] In reversing, however, the Supreme Court made it clear that they were not overruling Paul v. State of Virginia and thus were not invalidating state regulatory acts but merely upholding the applicability of federal regulation within its proper sphere. Congress was apparently not satisfied with this holding and thus passed the McCarran-Ferguson Act. As could be expected, cases subsequent to that Act have universally held continued state regulations to be valid,[9] if, indeed, reference to the Act was necessary.[10]

Not so clear, however, is the efficacy of McCarran-Ferguson in inhibiting federal control. True it is that in the moratorium period provided by Section 3(a) of McCarran-Ferguson[11] rather pervasive state regulation of the insurance industry was generally adopted.[12] True it is, further, that where an insurance company, acting nationwide in scope but on the local level, is controlled in those local activities by all of the states in which the activity is conducted, federal controls are inoperative.[13] It is far from clear, however, that activity which is essentially concerned with interstate commerce or with foreign commerce cannot be the subject of state control and thus cannot be exempt from federal control. When this question is squarely presented a vexing problem will be posed. Section 2(b)[14] of McCarran-Ferguson specifically states, in the proviso section, that the Sherman Act, the Clayton Act and the Federal Trade Commission Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State law". It is obvious, therefore, that Congress contemplated that there could be state regulation which would make the antitrust laws inapplicable. If there were any lingering doubt as to this contemplation of Congress, it would be dispelled by a consideration of Section 3(b) of McCarran-Ferguson[15] which provides that in any event, i. e., in case of the general inapplicability of the Sherman and Clayton Acts, agreements to boycott, coerce or intimidate or acts of boycott, coercion or intimidation will still be unlawful under the Sherman Act.[16]

7. United States v. South-Eastern Underwriters Ass'n, D.C.1943, 51 F.Supp. 712.

8. 1944, 322 U.S. 533, 64 S.Ct. 1162, 88 L. Ed. 1440.

9. See e. g. Prudential Insurance Co. v. Benjamin, 1946, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342; Maryland Casualty Co. v. Cushing, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806; Wilburn Boat Co. v. Fireman's Fund Insurance Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L. Ed. 337.

10. cf. Robertson v. People of State of California, 1946, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366, a companion case to Prudential Insurance Co. v. Benjamin, supra, footnote (8), wherein a criminal conviction under State law found subsequent to South-Eastern but prior to McCarran-Ferguson was upheld.

11. 15 U.S.C.A. § 1013(a).

12. See Appendix to Memorandum on Behalf of Associated Aviation Underwriters in Support of Motion to Quash Grand Jury Subpoena *Duces Tecum*.

13. F. T. C. v. National Casualty Co., 1958, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540.

14. 15 U.S.C.A. § 1012(b).

15. 15 U.S.C.A. § 1013(b).

16. At the argument of the motions Government counsel stated their intention of investigating to determine whether there exist violations of the antitrust laws oth-

The Government, however, argues that interstate and international combinations, conspiracies and monopolies cannot be controlled by state law and therefore must, despite the provisions of the McCarran-Ferguson Act and any attempted regulation by the states, no matter pervasive, be cognizable under the Sherman and Clayton Acts.

I am spared an attempt at solving this vexing problem by a concomitance of two factors.

The first of these factors is the failure of many states to regulate, at all, the fixing of rates for aircraft hull insurance and aircraft personal injury and death and property liability insurance. The second factor is the recent decision of the Supreme Court in Federal Trade Commission v. Travelers Health Ass'n.[17] That many states have failed to regulate rate fixing, at least with reference to aircraft hull and casualty insurance, is clear from the papers before me.[18] Thus, in the memorandum of AIRB, at page 28, it is stated:

"The Bureau is also licensed in, and regulated by four other states— California, Montana, New Jersey and North Carolina. It is not licensed in the other States of the Union as these other states exempt aviation insurance from their rate regulatory statutes."

In AAU's appendix it is stated, at page 1a:

"A. Regulation of Rate Making — * * * Every State without

exception has enacted extensive laws governing the entire rating function. The so-called All Industry Bill which appears at the commencement of Part 2 of this Appendix is directly applicable to Associated's rates on risks located throughout the United States, with the exception of aircraft hull and liability rates which are promulgated by the Aviation Insurance Rating Bureau."

Nowhere at all is the statement in the Government's memorandum, at page 12, —"However, forty-five of the states expressly exempted aviation insurance from rate regulation.", categorically denied by either of the movants.

Prior to the decision of the Supreme Court in Federal Trade Commission v. Travelers, the existence of the foregoing factor would not be sufficient to dispose of the present motions. This is so because, as cogently argued by movants, regulation by the domiciliary state of the movants' rate fixing activity which regulation, it is argued, has extra-territorial effect, might well be sufficient to bring into play the exemption of the McCarran-Ferguson Act. The Court of Appeals for the Eighth Circuit[19] had held such domiciliary state regulation of deceptive advertising of insurance to preclude the exercise of jurisdiction by the Federal Trade Commission. However, the Supreme Court reversed and remanded the case[20] on the ground that the type of state regulation which will satisfy the

---

er than those covered by Section 3(b) of McCarran-Ferguson. I cannot, therefore, avoid passing on the merits of the motions merely on the ground that the Government has a right to investigate violations excepted from the exemption of McCarran-Ferguson.

17. 80 S.Ct. 717.

18. It should be noted that hull and casualty insurance are far from "an insubstantial amount" of the aviation insurance business. Thus the possibility that F. T. C. v. National Casualty Co., supra, footnote (13), might be thought to hold the *de minimis* doctrine applicable to McCarran-Ferguson, cannot aid movants.

19. Travelers Health Ass'n v. Federal Trade Commission, 1959, 262 F.2d 241.

20. The *cease and desist* order was not reinstated because of a representation by Travelers Health Association that each of the states regulated the practices in question. However, such regulation did not appear in the record before the Supreme Court. Thus remand to the Court of Appeals, rather than reinstatement of the cease and desist order, was made, presumably for further development of the record as to such regulation. (cf. Footnote 4 of the Supreme Court Opinion, 80 S.Ct. 717.

380

mandate of McCarran-Ferguson is " * * regulation by the State in which the [unlawful activity] is practiced *and* has its impact" (Emphasis supplied) at page 721 of 80 S.Ct. and not regulation of a domiciliary state which purports to have extra-territorial effect.[21]

Federal Trade Commission v. Travelers Health Association is directly in point in this case. Despite the fact that most of the contracts entered into by AAU on behalf of its constituents are made in New York, and despite the fact that the rate fixing of AIRB is regulated by New York (which I assume *arguendo*), if unlawful activities are conducted with reference to rate fixing they will be "practiced and [have their] impact" in all states. New York's assumed complete regulation will not be effective, therefore, to oust the Antitrust Division of its jurisdiction to investigate possible violations of the Sherman and Clayton Acts.

As stated before, the only question actually presented to the court for decision is whether the federal antitrust laws are completely inapplicable to the aviation insurance industry at least insofar as the present movants are concerned. While I have determined this issue in the negative, I feel constrained, lest my opinion be interpreted more broadly than its intendment, to point out some limitations on the ruling. I have not attempted to determine the extent that the New York statutes regulate the insurance industry. I have not ruled that only rate fixing activities can be investigated. I have not ruled on the propriety of the subpoenas except to rule that they are not completely ineffectual.

The denial of the motions to quash is, therefore, without prejudice to any motions movants may feel desirable addressed to the scope of the subpoenas.

The motions are denied.

It is so ordered.

---

21. The majority opinion of the Supreme Court expressly refused to pass upon the constitutionality of the state statute which attempted to regulate advertising activities of a domicilary insurance company "in any other state".