Belknap,
No. 5450.

### TYLER ADVERTISING, INC. *v.* STEWART LAMPREY.

Argued February 1, 1966.
Decided March 30, 1966.

*Wescott & Millham* (*Mr. Peter V. Millham* orally), for the plaintiff.

*Devine, Millimet, McDonough, Stahl & Branch* and *Luke S. O'Neill, Jr.* ( *Mr. O'Neill* orally ), for the defendant.

DUNCAN, J. The issues presented by this transfer are limited by the generality of the exceptions to consideration of questions of law apparent upon the face of the findings and rulings. *Eastman* v. *Waisman,* 94 N. H. 253; *Racine* v. *Armstrong,* 100 N. H. 96. See *Lynch* v. *Grundy,* 98 N. H. 282, 284. The plaintiff's argument for the most part comes within that limitation.

The findings and rulings of the Trial Court, apart from those relating to the issue of whether a charge was made by the plaintiff for use of its plane by the pilot at the controls when the plane was damaged, were as follows:

"The Court finds that Tyler Advertising, Inc., through its president and agent, Henry J. Tyler, purchased insurance on three airplanes beginning in January of 1960 from the Lamprey & Lamprey insurance agency, having all of his dealings with Stewart Lamprey, the duly authorized agent of the insurance agency.

"The Court finds that during all of the period of negotiations the insurance agent was acting as a broker and did not have authority to bind the insurance company except as he was specifically notified as to binders by the insurance company.

"In January of 1960, Tyler Advertising, Inc. purchased a Globe Swift airplane and secured, through Lamprey Insurance Agency, a liability policy. While some inquiry was made at this time on the question of charter flight coverage, it was not pursued.

"On June 7, 1960, the Tyler Advertising, Inc., having traded the Globe Swift plane for a Beechcraft Bonanza, 1948 model, and because of the additional cost of this plane, made inquiry through Stewart Lamprey as to the cost of obtaining hull insurance, 'hull insurance' being the phrase used in airplane insurance to refer to coverage commonly known as collision coverage in the automobile insurance industry. Stewart Lamprey was unfamiliar with the aircraft policy field and in order to obtain information, from time to time, either by letter or by telephone, made his inquiries of the U. S. Aviation Underwriters who generally underwrite policies on aircraft insurance with various insurance companies. He was informed and communicated to Mr. Tyler that there were three possible types of hull coverage, and an application was filed on the 28th day of June, 1960, signed

by Mr. Tyler for the Tyler Advertising, Inc., requesting all risk ground, limited in-flight coverage, which has been checked on Plaintiff's Exhibit No. 3, the application for insurance, under Coverage 'A'.

"The Court finds that at this time there was a discussion as to what was meant by 'in-flight' coverage since Coverage 'A' specifically [covers] damage to the aircraft except while in flight, with certain exceptions, and defines 'in-flight' as being: 'The aircraft is "in-flight" from the time it moves forward in attempting to take off and continuing thereafter until it has completed its landing run.' An inquiry was made at this time as to whether this excluded losses occurring during taxiing, and Lamprey inquired and informed Tyler that it did not exclude taxiing accidents.

"The 1948 Bonanza was held until July 23, 1960, at which time it was sold and the policies, both liability and hull coverage, cancelled.

"In early August, 1960, a 1951 Beechcraft Bonanza was purchased by Tyler Advertising, Inc., and a request was made of Lamprey to secure coverage on this plane. The Court finds that coverage was secured the same as on the '48 Bonanza and that the company thereupon pro-rated rather than giving short term cancellation on the prior policy. The Court finds that at this time Tyler was informed that he had the same coverage as he had had on the Bonanza previously owned.

"The Court finds that there was a discussion between Harold Wescott, Jr., Henry J. Tyler and Stewart Lamprey at the office of Harold Wescott, Jr., called by Harold Wescott primarily because of his concern over liability insurance. The Court finds that there is a difference in opinion as to which was the most important matter to each of the participants in this conference but that three matters were discussed. One was a pilot by the name of Richard Lacasse, an employee of Wescott's company. The second was liability insurance, including liability insurance for passengers. The third was the question of hull coverage.

"The Court finds that at this discussion Tyler, in discussing hull insurance, stated that he was interested in taxiing and taking off coverage but not in in-flight coverage. There is no evidence, however, from which the Court can find that he ever requested specifically that Lamprey procure at this time any different coverage than was previously on the plane. The Court finds that

at this time Tyler was as fully informed as to the insurance coverage that he had as was Lamprey and that no negligence may be imputed to Lamprey for failing to change the coverage at this time.

"The Court further finds that particularly at the conference with Harold Wescott, Jr. it was made apparent to Lamprey that the plane was to be used by persons other than employees of the Tyler Advertising, Inc., in particular the employees of Harold Wescott, Jr. and Richard Lacasse of the Wescott Company . . . .

"The Court finds that on December 14, 1960, while the plane was being used by Harold Wescott, Jr., in returning from a flight to Keene, N. H., that the wheels retracted during the landing operation of the plane causing damage to the plane in the amount of $4,365.15 and that since the policy is a $300.00 deductible policy the damages to the plaintiff are in the amount of $4,065.15.

"The Court further finds that subsequent to the accident, Stewart Lamprey participated in processing the claim of the Tyler company and that he did not inform at any time the Tyler company that there was any question of coverage until coverage was denied by the company; that he processed the claim originally as though it were a ground accident. The Court further finds that both Tyler and Lamprey processed this claim as though there were coverage and as though they expected there was coverage."

The plaintiff's argument centers primarily upon the findings contained in the following paragraph: "The Court finds that at this discussion Tyler, in discussing hull insurance, stated that he was interested in taxiing and taking off coverage but not in in-flight coverage. There is no evidence, however, from which the Court can find that he ever requested specifically that Lamprey procure at this time any different coverage than was previously on the plane. The Court finds that at this time Tyler was as fully informed as to the insurance coverage that he had as was Lamprey and that no negligence may be imputed to Lamprey for failing to change the coverage at this time."

The plaintiff argues that the finding that Tyler "was interested in taxiing and taking off coverage but not in in-flight coverage" indicates that the Court believed the testimony of Tyler in preference to that of Lamprey, who denied that he was "asked at that conference to supply coverage for landing and taking off."

From this the plaintiff reasons that the Court indicated belief of Tyler's testimony that he "specified three or four times" at the conference in question "that he wanted to be sure that [the 1951 Beechcraft Bonanza] was covered during take-off and landing." Hence it argues, it must follow as a matter of law, that the defendant was negligent in failing to furnish the coverage which was thus requested, citing *Prescott* v. *Jones*, 69 N. H. 305; *Dufton* v. *Bank*, 95 N. H. 299 and *Mansfield* v. *Finance Corp.*, 99 N. H. 352.

We cannot accept this construction of the last quoted finding. It would be immediately contradicted by the next finding: "There is no evidence, however, from which the Court can find that he ever requested specifically that Lamprey procure at this time any different coverage than was previously on the plane." The findings must be construed in the light of the evidence before the Court. It appeared that Tyler had been "interested" at various times, in a variety of coverages. When the first plane was purchased in January 1960, Tyler and Lamprey went into the question of liability and hull coverage, as well as coverage for charter operations. At that time Tyler elected to procure only liability coverage. When he acquired the 1948 Bonanza, he admittedly conferred at length with Lamprey in Tyler's office, about hull coverage, and elected to purchase "coverage A," which was designated "All risks ground — limited in flight" coverage, by the application which Tyler signed on June 28, 1960. This specified that it covered "All Risks of physical loss of or damage to the aircraft except while in flight and in flight against the risks of Fire, Explosion . . . Lightning, Theft, Robbery, and Vandalism." As indicated by the findings, the application also specified: "The aircraft is 'in flight' from the time it moves forward in attempting to take off and continuing thereafter until it has completed its landing run."

Tyler elected to procure this "All risks ground — limited in flight" coverage for the 1948 Bonanza, in preference to the more expensive "coverage B" which was "All risks-ground and flight," covering: "All Risks of . . . damage to the aircraft while in flight as well as while not in flight," and in preference to "coverage C" covering loss from fire, explosion, lightning and transportation.

"Coverage A," above defined, was in effect as to the 1948 Bonanza from July 6, 1960 to July 23, 1960, when the Bonanza

was sold and the insurance cancelled. The evidence was that before this insurance was procured, the defendant Lamprey, at Tyler's request, ascertained from the insurer that coverage against loss while taxiing the plane upon the ground would be afforded under "Coverage A." With respect to this coverage, Tyler testified at the trial that "coverage A" was the coverage which he wanted for that plane, and that he thought it "covered it for landing and take-off." He conceded that he had previously testified on deposition: "From what I am able to determine, my own interpretation of this [application], 'A' gives me the coverage that I want."

Under date of August 8, 1960, the insurer notified Lamprey that the policy insuring the 1948 Bonanza had been cancelled as of July 23, 1960, the date of sale of the plane. Similarly on August 11, 1960, it notified him that it was binding the same coverage for the 1951 Bonanza. The new policy was not in fact written until August 17, 1960.

Lamprey testified that when the coverage for the 1948 aircraft was under discussion, Tyler was not interested in full "in flight" coverage because "he felt it would be a catastrophe, fatal, and he wasn't going to worry about it too much."

According to Lamprey, the occasion for the conference in Wescott's office on or about August 10, was to complete an application on one of Wescott's employees listed in the policy as a pilot who might operate the plane. Wescott and Tyler did not dispute this, but testified that coverage against damage to the plane was also discussed, including coverage while taxiing. Lamprey recalled that Wescott asked him if there was hull coverage, and that he replied that there was. Both Wescott and Tyler testified that Tyler specified he wanted coverage for taking off and landing, while Lamprey denied that he was asked or had agreed to furnish it, although at a later date Tyler sought to increase the amount of coverage from $6,000 to $10,000.

Against this background of discussion of possible coverages over a period of seven months, the Trial Court's findings that at the conference in Wescott's office Tyler "stated that he was interested in taxiing and taking off coverage" cannot be taken as a finding that he requested Lamprey to procure take-off and landing coverage. "Taking-off" coverage was not available except under "Coverage B" which Tyler had declined to purchase previously. The finding that Tyler never requested any different coverage than was previously chosen by him, is borne

out by the record. Tyler himself testified that he "didn't know that he was making any distinction" between the two aircrafts, or that he wanted a "different" type of coverage.

While the Court could have found from Tyler's testimony that he requested coverage for taking off and landing operations, the evidence did not compel such a finding, and the defendant's testimony warranted the finding that it was not requested. In the absence of such a finding the verdict for the defendant must be sustained. *Franklin* v. *Wirz*, 104 N. H. 335, 338. This conclusion makes it unnecessary to consider the issue concerning the exclusion from coverage of "use . . . for which a charge is made."

*Exceptions overruled.*

All concurred.