[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 21-14361

Non-Argument Calendar

————————————

NUEBERT AERO CORPORATION,

Plaintiff-Appellant,

*versus*

STARSTONE NATIONAL INSURANCE COMPANY,

LONDON AVIATION UNDERWRITERS, INC.,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:20-cv-00045

————————————

Before JILL PRYOR, NEWSOM, and BRANCH, Circuit Judges.

PER CURIAM:

Nuebert Aero Corporation insured a new airplane—with Tim Nuebert as its pilot.[1]  Because of his lack of experience flying this type of airplane, before the policy would cover him for solo flights, it required that he meet rating, formal training, and flight-hour requirements.  As part of his training—but before achieving his FAA pilot certificate rating—Nuebert flew solo and damaged the airplane in an emergency landing.  His insurers denied coverage because of his breach of the rating requirement.

Nuebert sought a declaratory judgment in state court.  After the insurers removed the case to federal court, they sought summary judgment.  Nuebert opposed it, arguing (i) that he did not breach the policy and (ii) that, even if he did, Florida's so-called "anti-technicality statute" applied.  *See* Fla. Stat. § 627.409(2).  The magistrate judge recommended granting summary judgment because Nuebert breached the policy—but, in so doing, he ignored Nuebert's argument about the anti-technicality statute.  Accepting the magistrate judge's recommendations, the district court granted the insurers' motion for summary judgment.

---

[1] For ease of exposition, we will refer to both Nuebert Aero Corporation and Tim Nuebert simply as Nuebert.  Neither party contends that the existence of the corporate entity affects the outcome of this appeal.

Nuebert appeals on two grounds.  First, he contends that the court erred in granting summary judgment on whether he breached the policy.  Second, he argues that the court erred by failing to apply Florida's anti-technicality statute.

We affirm the district court's decision that Nuebert breached the condition, but reverse and remand for the district court to consider the application of the anti-technicality statute.

## I

The insurers claim that Nuebert breached the ratings portion of a special condition in the policy.  That condition required that "[p]rior to solo in the [airplane] . . . Neubert must have obtained a multiengine rating and an instrument rating for multiengine aircraft."  The magistrate judge and district court agreed that Nuebert breached the condition, and thus granted summary judgment.

"We review a district court's grant of summary judgment *de novo*, considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party.  Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022) (citations omitted).

Under Florida law, "[i]nsurance contracts are construed according to their plain meaning, with any ambiguities construed

against the insurer and in favor of coverage." *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007).

Pilot certification and ratings are governed by a series of complicated federal regulations. In particular, 14 C.F.R. § 61.31 requires that:

> To serve as the pilot in command of an aircraft, a person must—
>
> (1) Hold the appropriate category, class, and type *rating* (if a class or type rating is required) for the aircraft to be flown; or
>
> (2) Have received training required by this part that is appropriate to the pilot certification level, aircraft category, class, and type rating (if a class or type rating is required) for the aircraft to be flown, and have received an *endorsement* for solo flight in that aircraft from an authorized instructor.

14 C.F.R. § 61.31(d) (emphasis added). But "[t]he rating limitations of this section do not apply to . . . [t]he holder of a student pilot *certificate*." *Id.* § 61.31(l)(2)(ii) (emphasis added).

The parties agree on two key facts. Nuebert *did not* have a multiengine rating on his pilot certificate for purposes of

§ 61.31(d)(1).  He *did*, however, have an endorsement from his instructor—satisfying § 61.31(d)(2).[2]

The magistrate judge recommended summary judgment because—in his opinion—"rating" unambiguously referred to § 61.31(d)(1) ratings and not endorsements or certificates.

Nuebert's primary argument in response is that a common way to obtain the *rating* is through *endorsed* solo flying.  Because the policy specifically contemplated him obtaining the rating, he says, we should interpret its coverage to include his training for that rating.  But endorsed solo flying is not necessary to obtain a rating.[3]

We agree with the magistrate judge's and district court's conclusion that "multiengine rating" in the policy unambiguously means "multiengine rating" under the federal regulations

---

[2] Portions of the record also suggest that Nuebert held a student pilot certificate.  The presence or absence of a student pilot certificate would not affect our interpretation of "rating" in the policy condition.

[3] Nuebert disputes this, relying on FAA guidance that solo flight time is generally required for a new category rating.  But going from "single-engine" to "multiengine" is a new "class" rating, not a new "category" rating.  14 C.F.R. § 61.5(b).  And new class ratings are explicitly exempt from the training-time requirements (but new category ratings are not).  *Id.* § 61.63(b), (c)(3).  Nuebert raises the point that he must take one solo flight before getting rated—his "check ride," *i.e.*, the pilot equivalent of a driver's test.  But that doesn't suddenly render the unambiguous language ambiguous, as he argues.  At most, it suggests an interpretation of solo that would not include flying with an examiner.

governing pilots.  *See* 14 C.F.R. § 61.5(b)(2).  And the implication that this insurance policy limited Nuebert to one particular way of obtaining that rating is neither absurd nor troubling.

Nuebert separately objects to the district court's consideration of certain expert testimony.  But we can affirm summary judgment on any ground in the record.  *Blackman v. United Cap. Invs., Inc.*, 12 F.3d 1030, 1033 (11th Cir. 1994).  Here, we determine summary judgment was appropriate without considering this expert testimony and decline to address whether it was inappropriately considered.

The district court correctly held that Nuebert breached the policy condition.[4]

## II

But even if Nuebert breached, he argues that Florida's so-called "anti-technicality" statute required the insurers to show that his breach contributed to the loss.  That statute provides that:

> A breach or violation by the insured of a warranty, condition, or provision of a wet marine or transportation insurance policy, contract of insurance, endorsement, or application does not void the policy or

---

[4] At points in the briefs, Nuebert also suggests a challenge to the interpretation of the phrase "prior to solo in" based on the same arguments that he advances for the ratings language.  To the extent that Nuebert has not forfeited this argument by failing to clearly raise it, we reject it as contrary to the unambiguous language of the policy.

21-12101                Opinion of the Court                7

contract, or constitute a defense to a loss thereon, un-
less such breach or violation increased the hazard by
any means within the control of the insured.

Fla. Stat. § 627.409(2).

A threshold question:  Is this aircraft-insurance policy "a wet
marine or transportation insurance policy?"  If so, the district court
erred by not considering the statute.

When deciding state-law claims, we apply state law to sub-
stantive legal issues.  *See Ungaro–Benages v. Dresdner Bank AG*,
379 F.3d 1227, 1232 (11th Cir. 2004); 28 U.S.C. § 1652.  In doing so,
we defer to the state supreme court's interpretation of its own law.
*LeFrere v. Quezada*, 582 F.3d 1260, 1263–64 (11th Cir. 2009).  If the
state supreme court has not addressed the question, we defer to the
state's intermediate appellate courts "absent some persuasive indi-
cation that the state's highest court would decide the issue other-
wise."  *People's Gas Sys. v. Posen Constr., Inc.*, 931 F.3d 1337, 1339
(11th Cir. 2019) (quotation omitted).

Two Florida District Courts of Appeals cases have expressly
applied this statute to aircraft-insurance policies.  *Florida Power &
Light Co. v. Foremost Ins. Co.*, 433 So. 2d 536, 536 (Fla. Dist. Ct.
App. 1983); *Pickett v. Woods*, 404 So. 2d 1152, 1153 (Fla. Dist. Ct.
App. 1981); *see also United States Aviation Underwriters, Inc. v.
Sunray Airline, Inc.*, 543 So. 2d 1309, 1311 (Fla. Dist. Ct. App. 1989)
(characterizing *Pickett* as "holding that section 627.409(2) . . .

applies to aviation insurance policies").[5]  Both cases acknowledged their departure from previous aircraft-insurance precedents due to the passage of § 627.409(2) in the interim.  But neither elaborates on why § 627.409(2) applies to aircraft.

Nuebert argues that these cases reflect the legislative purpose—as found in legislative history—that the provision apply beyond merely "wet marine and transportation insurance" policies. But, to be clear, neither state-court case mentions this.

The insurers emphasize the purportedly atextual nature of this holding and point us to the Florida Supreme Court's practice of applying the plain language of unambiguous statutes.  *See Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009) (collecting Florida Supreme Court cases).  They argue that "wet marine or transportation insurance" is a defined term meaning:

> that part of marine insurance which includes only:
>
> (a) Insurance upon vessels, crafts, and hulls and of interests therein or with relation thereto;
>
> (b) Insurance of marine builders' risks, marine war risks, and contracts of marine protection and indemnity insurance;

---

[5] The insurers' attempt to identify a case to the contrary fails.  That case—as their own brief concedes—addresses a homeowners' insurance policy.  *See Independent Fire Ins. Co. v. Paulekas*, 633 So. 2d 1111 (Fla. Dist. Ct. App. 1994).

(c) Insurance of freights and disbursements pertaining to a subject of insurance coming within this definition; and

(d) Insurance of personal property and interests therein, in course of exportation from or importation into any country, or in course of transportation coastwise or on inland waters, including transportation by land, water, or air from point of origin to final destination, in respect to, appertaining to, or in connection with any and all risks or perils of navigation, transit, or transportation, and while being prepared for and while awaiting shipment, and during any delays, storage, transshipment, or reshipment incident thereto.

Fla. Stat. Ann. § 624.607(2).

In other words, "wet marine or transportation insurance" must be both "marine insurance" and fall within one of four specified categories. The insurers argue aircraft insurance is "plainly not marine insurance"—and thus don't continue on to discuss the other four categories. But the insurers overlook that "marine insurance" is itself a defined term including "insurance against . . . [v]essels, craft, *aircraft*, cars, automobiles, and vehicles of every kind . . . in connection with any and all risks or perils of navigation, transit, or transportation . . ." *Id.* § 624.607(1)(a) (emphasis added).[6]

---

[6] The lengthy definition provides: "(a) Insurance against any kinds of loss or damage to: 1. Vessels, craft, aircraft, cars, automobiles, and vehicles of every kind, as well as all goods, freights, cargoes, merchandise, effects,

So the question becomes whether aviation insurance fits into one of the four categories of § 624.607(2).  And the type of insurance at issue here—often called "hull insurance," at least in the era that this definition was enacted—falls within subsection (a)'s "[i]nsurance upon vessels, crafts, and hulls."  *See Hull insurance*, *Black's Law Dictionary* (6th ed. 1990) ("Marine or aviation insurance covering loss to vessel or plane or its machinery or equipment"); Lewis E. Davids, *Dictionary of Insurance* 103 (1959) (describing a "hull policy" as "[a]n ocean or river marine or aviation insurance contract covering the ship or plane itself"); *see also* Matthew G. Berard, *Flying Cars: The Reconciliation of Aircraft and Automobile Insurance Policies*, 47 Tort Trial & Ins. Prac. L.J. 781, 785 (2012) ("Hull insurance covers the aircraft, including the engine, propeller, and all other systems permanently attached to the aircraft, such as avionics.  Standard form aviation hull coverage is typically written to cover risks arising out of particular modes of operation--that is, risks taking place while the aircraft is in flight, taxiing,

---

disbursements, profits, moneys, bullion, precious stones, securities, choses in action, evidences of debt, valuable papers, bottomry and respondentia interests and all other kinds of property and interests therein, in respect to, appertaining to, or in connection with any and all risks or perils of navigation, transit, or transportation, including war risks, on or under any seas or other waters, on land or in the air, or while being assembled, packed, crated, baled, compressed, or similarly prepared for shipment or while awaiting the same or during any delays, storage, transshipment, or reshipment incident thereto, including marine builder's risks and all personal property floater risks."

21-12101                Opinion of the Court                11

or on the ground or moored.  Aircraft hull is derived from the ma-
rine term 'hull.'").[7]

Even if we might decide that aircraft aren't included in the
statutory definition if deciding the question on our own, "[s]tate
law is what the state appellate courts say it is, and we are bound to
apply a decision of a state appellate court about state law even if
we think that decision is wrong."  *Winn-Dixie Stores, Inc. v. Dol-
gencorp, LLC*, 881 F.3d 835, 848 (11th Cir. 2018).  And a close stat-
utory question doesn't present the type of "persuasive indication"
that today's Florida Supreme Court would disagree with those
courts' decisions.

---

[7] Notably, § 624.607(1)(a)'s definition was part of an extensive insurance code
enacted in 1959, *see* Florida Laws 1959, c. 59-205, § 105, and at that time, "hull"
terminology was pervasive.  For example, a 1960 congressional report on "The
Insurance Industry: Aviation, Ocean Marine, and State Regulation" uses the
term "hull" 19 times in its 25-page summary of the aviation insurance industry.
S. Rep. No. 86-1834, at 16–42 (1960).  In addition to discussing "hull insurance,"
the report also uses "hull" as a standalone noun, similar to the phrasing in the
statute.  *E.g.*, *id.* at 16 (discussing the maximum insurance "on any one hull");
*id.* at 24 ("the total value of the hulls insured").  Court cases from that era
similarly explain "hull insurance" as applying to airplanes.  *E.g.*, *Tyler Advert.,
Inc. v. Lamprey*, 107 N.H. 138, 139, 218 A.2d 71, 72 (1966) ("'hull insurance'
being the phrase used in airplane insurance to refer to coverage commonly
known as collision coverage in the automobile insurance industry"); *In re Avi-
ation Ins. Indus.*, 183 F. Supp. 374, 375 (S.D.N.Y. 1960) (describing "hull insur-
ance" as one of five types of aviation insurance).

12                     Opinion of the Court                    21-12101

The district court should, therefore, have followed the state courts in applying Florida's anti-technicality statute to aircraft insurance.

The insurers make two further arguments—but both should be considered first by the district court on remand. First, they argue that the statute doesn't apply to exclusions and that along with the *condition* the district court discussed, this policy also has an *exclusion* for similar conduct.[8]  But Nuebert correctly points out that the exclusion provision was not interpreted by the district court in its summary judgment order. Because it is not before us, we refrain from addressing either whether the anti-technicality statute applies to exclusions or whether the conduct here fits the exclusion.

_____

[8] The insurers point out that the district court previously addressed this statute in a later-reconsidered ruling on a motion to dismiss. There, the district court held that the statute did not apply to exclusions and that the activity here fell within the policy's exclusion. But it later granted leave to amend the complaint. And the issue remained part of the case. In rejecting the insurers' first motion for summary judgment, the court mentioned the issue but declined to reach it.

The exclusions language differs slightly from the conditions language: "any pilot . . . is not certified for the make and model being flown and currently rated for the flight involved." Without the benefit of detailed briefing on the issue, we leave to the district court in the first instance the question whether "rated for the flight involved" also unambiguously refers to the federal multiengine rating. We also express no opinion on the reasoning of the district court's initial discussion of whether § 627.409(2) applies to exclusions.

21-12101                Opinion of the Court                13

Second, the insurers argue that even if the statute applies, they prevail. But this, also, is a matter for the district court in the first instance.

We, therefore, vacate the grant of summary judgment for the insurers and remand for the district court to consider the application of the anti-technicality statute.

**AFFIRMED in part, VACATED in part, and REMANDED.**